IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 2, 2014

**IN RE KAIDEN T.**

**Appeal from the Chancery Court for Overton County**
**No. 13-CV-4      Ronald Thurman, Chancellor**

**No. M2014-00423-COA-R3-PT - Filed December 15, 2014**

Mother appeals the termination of her parental rights contending the evidence was insufficient to prove any ground or that it was in the child's best interest to terminate her parental rights. The trial court found that the petitioners, the father and step-mother, proved two grounds of abandonment, failure to support and failure to visit the child, pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(i), and that termination of Mother's rights was in the best interest of the child, pursuant to Tenn. Code Ann. §§ 36-1-113(c)(2) and (i). We have determined the evidence is sufficient to prove both grounds of abandonment; therefore, we affirm the trial court's findings on both of these issues. However, we must remand the issue of the child's best interest, due to the lack of specific findings of fact as mandated by Tenn. Code Ann. § 36-1-113(k). Therefore, we reverse and remand with instructions for the trial court to provide specific findings of fact concerning whether termination of Mother's parental rights is in the best interest of the child and to enter judgment consistent with its findings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, and Remanded**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Andrea McLerran Ayers, Livingston, Tennessee, for the appellant, Nicole W.[1]

Michael Savage, Livingston, Tennessee, for the appellees, Brandon and Valerie T.

---

[1]This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

**OPINION**

Brandon T. ("Father") and Nicole W. ("Mother") are the biological parents of one child, Kaiden T., born in November 2005. Following the child's birth, Mother had primary custody and Father had visitation every other weekend and Thursdays on his off weeks. When the child was a year old, Mother and Father agreed to joint custody, alternating weekly visitation, which arrangement remained in effect until March 2010, when Mother was arrested for selling drugs. Soon thereafter, the parents entered an agreed order whereby Father was granted custody and Mother's contact with the child was restricted to supervised visitation, to be coordinated by the parents; she was also allowed visitation at the child's sporting events and two weekly telephone calls at 7:00 p.m. on Tuesdays and Thursdays. Because Mother was unemployed, the issue of child support was reserved for further hearing.[2]

Since March 2010, the child has resided with Father and Valerie T. ("Step-mother"), who have been married for eight years, in Livingston, Tennessee. Mother has resided with her fiancé, Ricky Jones, at his home in Pleasant Shade, Tennessee, since 2012.

On January 30, 2013, Father and Step-mother filed the instant petition to terminate Mother's parental rights and for step-parent adoption, based on abandonment for willful failure to visit and for willful failure to support.[3] Petitioners alleged that Mother had either failed to visit the child altogether or engaged in only token visitation and that Mother had never paid child support. They further asserted that it was in the child's best interest to terminate Mother's parental rights and to allow Step-mother to adopt the child "and legally become said minor child's mother with all the duties and responsibilities attached to said relationship." The trial court appointed counsel to represent Mother and a Guardian Ad Litem to represent the interest of the child.

A one-day trial was conducted on January 27, 2014, with Mother, Father, and Step-mother testifying. Also testifying, was a friend of Mother's and the child's teachers and karate instructor. The testimony regarding Mother's relationship with the child and her visitation with the child pursuant to the 2010 order revealed that she was entitled to visit the

---

[2]At a later date, not identified in this record, but prior to June 2013, Mother was ordered to pay child support to Father; the amount and other details are not provided.

[3]As we noted in *In re Adoption of Z.J.D.*, No. M2012-01596-COA-R3-PT, 2013 WL 870654 (Tenn. Ct. App. Mar.7, 2013), a parent has no standing to petition for the termination of the other parent's parental rights but is a necessary party to the petition for adoption by a step-parent. *Id.* at *1, n.1 (citing Tenn. Code Ann. § 36-1-113(b); Tenn. Code Ann. § 36-1-115(c); *Osborn v. Marr*, 127 S.W.3d 737, 739-40 (Tenn. 2004)).

child at the child's sporting events and other supervised visitation that could be arranged at the convenience of the parents; however, Mother attended less than ten sporting events since 2010, even though the child consistently attended karate lessons on Tuesday afternoons at the same time and location. Father testified that Mother missed "hundreds" of the child's sporting events, and the last time she attended a karate lesson, pre-petition, was in early 2011. Mother's last "scheduled" visitation was Christmas 2010. Father and Step-mother testified that they arranged for Christmas visitation in December 2011 at a local McDonald's but Mother failed to attend. Mother, for her part, testified that she does not remember scheduling visitation with the child in December 2011.

Mother testified that every time she told Father or Step-mother that she planned to visit the child at karate, they would not be there. Step-mother testified that there had indeed been times when the child missed his karate class and she did not notify Mother, but Step-mother denied that she had ever intentionally discouraged a relationship between Mother and the child. Mother described two specific requests for visitation with the child, which never transpired. One was in September 2011 when her mother came to visit and arranged for breakfast with the child, but Father and Step-mother canceled at the last minute. The second was a request in November 2013, when her father was coming to visit. Mother claimed she texted Step-mother a request, but did not receive a response. Notably, however, neither of these requests were during the four months preceding the petition, and Mother provided no other instances of being denied visitation requests either during or before the relevant four-month period.

The 2010 custody order also allowed two telephone calls per week with her child on Tuesdays and Thursdays at 7:00 p.m., and Mother was to initiate the calls. Mother testified that she called her son regularly, and also set her phone alarm to remind her to call. Mother testified that she initiated "several calls" during the four months preceding the petition, but that the majority of the time, her calls would go unanswered and unreturned. Step-mother and Father both testified that, in the beginning, they were cooperative with the telephone call schedule, but that Mother's calls to the child were sporadic at best. Over time, Father and Step-mother became concerned when Mother spoke with the child and promised visitation, but would then "no-show," and when she promised gifts to the child, but never followed through. Both Father and Step-mother testified that they felt Mother's empty promises were taking a toll on the child. Step-mother testified that after the child spoke with his mother, he was very emotional, nervous, bit his nails, fidgeted, and had sleeping problems. Father testified that to protect his son, he gave Mother an ultimatum. He told Mother that if she did not stop making promises upon which she did not deliver, he would end the scheduled calls. Mother, conversely, denied promising her son gifts or that she would be at visitation and then not appear. After Mother failed to appear for Christmas visitation in 2011, Father and Step-mother decided it was necessary to avoid Mother's court-ordered telephone calls, and they

did not allow Mother to converse with the child via telephone, until after the petition was filed.

With respect to child support, it was undisputed that Mother has never paid support and that she is not disabled. Mother testified that she never received notice of the child support hearing, did not attend or have representation at the hearing, and was not even aware that child support had been ordered until June of 2013. Mother further testified that she has no income and that she has not worked since she left her position at a gas station in 2011, other than helping her fiancé, Mr. Jones, with his chickens. Mother testified that she is supported by Mr. Jones, that they share one vehicle, and that they are living on a shoestring budget, earning just enough money to cover their living expenses.

Mother stated she is unemployed because she does not have a driver's license. Mother lost her license after she received a $5,000 fine in 2008; her license remains suspended until the fine is paid in full. Mother testified that her father and Mr. Jones have helped her pay the fine, and that the balance owing as of trial was $500. She further testified that she intends to pay child support for the child once she regains her license and is able to work.

In the trial court's ruling from the bench, the court stated:

Well, when we look at the statute, Section 36-1-213, and whether or not there has been abandonment by [Mother], . . . the relevant time frame is what transpired in the four months preceding the filing of the petition, which was [January] 30th, 2013.

What the statute requires is a showing by a standard of clear and convincing evidence that at that time the parent did not willfully visit or provide support. . . . By her own testimony, she hasn't provided support. She has not provided any support. She is not disabled and works for her boyfriend and fiancé. There is no evidence in the record that she couldn't have. Really, I don't think she tried to get a job. I know she has a problem with not having a driver's license, but there is no substantial evidence to show she has made any effort to get a job and pay the child support.

I know she has testified she wasn't aware of the court date setting child support. I believe she was aware. She had been placed on notice by her attorney, Mr. Randolph, at the time, even though she testified she didn't tell her attorney at the time where she changed addresses, but for this court to set child support, be that as it may, under the state law of the State of Tennessee, the parents are obligated to take care of a minor child.

It is not fair for anybody to carry the whole load. Both [Father] and [Mother] brought the child into the world. They both have an obligation to take care of the child. It is clear that [Mother] hasn't provided that support. I find, based on the testimony, that [Mother] works with her boyfriend raising chickens, and if they earn income that way and have survived, she has not met her obligation to pay child support.

As far as visitation, that has been somewhat sporadic. I think, as far as the cut-off phone calls by [Father and Step-mother], they don't have the right to modify court orders. The only person that has a right to modify a court order would be myself or the appellate court. They testified they did so in the child's best interest.

I find that [Mother] has not visited the child during that period of four months preceding the filing of the petition to terminate her parental rights. I really can't say that she made an effort to try to visit. The fact is that [Mother] did not come to court to tell me about the cut-off phone calls. If I found out anyone had violated a court order, I would put them in jail, if that was brought before me, but that was not brought before me.

I know she testified about being in front of me and saying "I couldn't make phone calls and visit a lot of times." [Mother] has had issues, I guess, with her ex-husband being in jail, having gotten arrested on drug charges, but the court finds clear and convincing evidence that she has not visited her child in the four months preceding the filing of the petition for termination of her parental rights.

Now, it is one of the hardest things I have to do in my job, but my obligation is to look out for the best interests of the child in this case, Kaiden L.T., and the court finds that [Father and Step-mother] have been providing all of the support and have been acting as parents to the child, and the child has bonded well with his stepmother. The court finds clear and convincing evidence that it is in the best interest of Kaiden L.T. for termination to occur.

. . .

In its written order, the trial court found that Father and Step-mother had proven by clear and convincing evidence, pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(i), that Mother willfully failed to support her child or make reasonable payments toward support in

the four months preceding the petition, and that she had willfully failed to visit her child in the four months preceding the petition. The trial court also expressly found Mother's testimony "was less than credible" concerning her contact with the child.[4] Based on this and other evidence, the court concluded that Mother had abandoned her child. The trial court additionally concluded that Father and Step-mother had proven by clear and convincing evidence that it was in the child's best interest that Mother's parental rights be terminated. Based upon the foregoing, the court granted the petition to terminate the parental rights of Mother. This appeal followed.

## ANALYSIS

### I. ABANDONMENT

Parental rights may be terminated for abandonment, pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(i), where a parent "willfully" fails to visit or support their child or "willfully" fails to make reasonable payments toward the support of the child for the four months preceding the filing of the petition to terminate that parent's rights. A parent's willful conduct is an essential element of the statutory definition of abandonment. *See In re C.T.B.*, No. M2009-00316-COA-R3-PT, 2009 WL 1939826, at *4 (Tenn. Ct. App. July 6, 2009); *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). Willful conduct, as used in the statute, consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. *In re Audrey S.*, 182 S.W.3d at 863 (citations omitted). "Conduct is 'willful' if it is the product of free will rather than coercion." *Id*. A parent's failure to visit or support a child is "willful" when a parent "is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id*. at 864 (citing *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)); *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005) (citing *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-PT, 2004 WL 1085228, at *4 (Tenn. Ct. App. May 12, 2004)).

Whether a parent failed to visit or support a child is a question of fact. *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law. *Id*. We review questions of law de novo with no presumption of correctness. *Id*.

---

[4]The trial court's credibility determination was based upon discrepancies it found in Mother's testimony. With respect to the phone calls Mother asserted she made to the child, the trial court stated from the bench, "She said she made all of those phone calls, but she was in jail part of this time." The trial court also noted Mother's testimony that she did not know the where the child went to school was contradicted by her own witness, Ms. Meyer, who testified that "she felt [Mother] knew where the [child's] school was[.]"

As noted above, the termination of Mother's parental rights was premised on both abandonment for willful failure to support, as well as abandonment for willful failure to visit. We will examine each of these statutory grounds in turn, beginning with the trial court's finding of abandonment for willful failure to support. For the purposes of this analysis, the relevant four-month period preceding the petition to terminate Mother's parental rights spans September 29, 2012, to January 29, 2013.

## A. WILLFUL FAILURE TO SUPPORT THE CHILD

To find Mother abandoned her child by failing to support him financially, it must be established that the failure to support was "willful." *In re R.L.F.*, 278 S.W.3d 305, 320 (Tenn. Ct. App. 2008). Failure to pay support is "willful" if the parent "is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." *In Re J.J.C.*, 148 S.W.3d 919, 926 (Tenn. Ct. App. 2004) (quoting *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003)). The fact the parent was not under an order to pay support is not dispositive of the question of whether the failure is willful; the obligation to pay support exists in the absence of a specific order. *Tenn. Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 524 (Tenn. Ct. App. 2004). The foregoing notwithstanding, a parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control. *In re Adoption of Angela E.*, 402 S.W.3d at 639 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810 (holding that the evidence did not support a finding that the parents "intentionally abandoned" their child)).

Mother admitted that she did not pay any child support for the child during the relevant four-month period. Mother contends, however, that her failure to support was not willful because she lacked the financial means to pay support and could not get a job because she did not have a driver's license.

The element of "willfulness" of a parent's actions hinges on his or her intent, which is usually incapable of direct proof. *In re B.P.C.*, No. M2006-02084-COAR3-PT, 2007 WL 1159199, at *10 (Tenn. Ct. App. April 18, 2007) (citing *In re Audrey S.*, 182 S.W.3d at 864). Thus, intent must often be inferred from circumstantial evidence drawn from the parent's actions or conduct. *Id.*

With regard to Mother's willful failure to support, the trial court specifically found that Mother had an affirmative duty to support her child regardless of an order to that effect, and, although Mother did not receive wages from her fiancé, they jointly earned income from which she could have paid some support, yet she never paid any support. Finally, the trial

court found that Mother had exerted no effort to find work that paid her a wage in order to provide support for her child; instead, Mother chose to help her fiancé raise his chickens, for which she received no compensation other than room and board.

In support of the trial court's determination, Mother testified she worked on her fiancé's farm taking care of 600 chickens; however, when asked how much money she made, Mother replied, "I don't make nothing personally, but I have a roof over my head and everything I need." In regards to Mother's ability to obtain employment that paid her a wage, she testified she could not get a job because she did not have a driver's license; however, the record reveals that Mother's driver's license was suspended in 2008, and Mother was able to maintain employment at a gas station *without a driver's license* until 2011. Moreover, Mother provided no support for the child prior to leaving that job. These facts, along with others, justifiably caused the trial court to question Mother's credibility.

Based upon the foregoing and other evidence in the record, including the trial court's adverse credibility finding concerning Mother, it has been established by clear and convincing evidence that Mother's failure to pay any support during the relevant period was willful. Accordingly, we affirm the trial court's finding that Mother abandoned the child by failing to support him. We shall now address whether the evidence established by the requisite standard that Mother abandoned the child by willfully failing to visit.

B. WILLFUL FAILURE TO VISIT THE CHILD

The trial court found that Mother willfully failed to visit the child during the four-month period preceding the filing of the petition, that being September 29, 2012 to January 29, 2013, and that she had not made any real effort to visit the child during that period.

Mother does not dispute the finding that she failed to visit during the relevant time period; however, she challenges the trial court's finding that her failure to visit was "willful," arguing that Father and Step-mother thwarted her efforts by repeatedly ignoring and/or denying her scheduled weekly telephone calls with the child.

Mother correctly notes that when a parent attempts to visit his child, but is "thwarted by the acts of others," the failure to visit is not willful." *In re M.L.P.*, 281 S.W.3d 387, 392 (Tenn. 2009) (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810); *see also In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). However, "[a] parent's failure to visit may be excused by the acts of another only if those acts *actually prevent* the parent from visiting the child or constitute a *significant* restraint or *interference* with the parent's attempts to visit the child." *In re M.L.P.*, 281 S.W.3d at 393 (emphasis added) (citing *In re Audrey S.*, 182 S.W.3d at 864); *see also In re F.R.R.*, III, 193 S.W.3d 528, 530 (Tenn. 2006). Examples of conduct

that amounts to a significant restraint or interference include blocking access to the child, keeping the child's whereabouts unknown, and/or vigorously resisting a parent's efforts to support or to visit the child. *In re Audrey S.*, 182 S.W.3d at 864 n.34.

Although blocking calls, under certain circumstances, may constitute "blocking access to the child," telephone calls are not generally a substitute for in-person visitation for the purposes of determining whether a parent has willfully abandoned a child. *See In re Adoption of Marissa O.R.*, No. W2013-01733-COA-R3-PT, 2014 WL 2475574, at *14-15 (Tenn. Ct. App. May 30, 2014) (citing *In re Keri C.*, 384 S.W.3d 731, 747-52 (Tenn. Ct. App. 2010)). Nevertheless, under certain circumstances, e.g., when the parent must travel an extensive distance to visit the child, telephone calls may be material in determining whether the failure to visit was willful. *See In re Caira D.*, No. M2014-01229-COA-R3-PT, 2014 WL 6680696, (Tenn. Ct. App. Nov. 25, 2014).[5] We must also emphasize that Father and Step-mother's unilateral attempt to modify the court order by ignoring or avoiding Mother's telephone calls to the child is not to be condoned. Indeed, the trial court acknowledged that this behavior may have warranted a finding of contempt if Mother had brought that to the court's attention; however, it was not.

With respect to visitation, Mother had approximately fifteen court-authorized opportunities to visit the child in the four months preceding the petition, specifically during the child's sporting activities. It was undisputed that Mother made one attempt, albeit unsuccessful, to visit the child during the four-month period when she appeared at the child's karate lesson on November 20, 2012, only to discover that the child had not attended that day. Although Mother made this one effort, there was no evidence that her failure to see her child on this one day was the result of an intentional act by Father or Step-mother to interfere with Mother's visitation, and there was no testimony that Father and Step-mother even knew that Mother was planning to attend this particular karate lesson. To the contrary, this was

---

[5]In *Caira D.*, it was a seven-hour one-way trip for the father to visit his children. *Id.*, 2014 WL 6680696, *7. Moreover, the father had very modest financial means, he had no driver's license, and there was no evidence that anyone was willing to provide transportation or to drive him to visit his children. *Id.* Considering these facts, the court found it significant that although the father had not visited his children in-person during the relevant period, he spoke with them by phone for approximately twenty minutes at least every other week. *Id.* After considering the unusual circumstances of that case, the court found the evidence insufficient to establish by clear and convincing evidence that the father had willfully failed to visit his children. *Id.* Similarly, in *In re B. D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922 (Tenn. Ct. App. Mar. 2, 2009), although the mother only visited the children three or four times during the relevant four-month period, the court found that her distance from the children - the mother lived in Illinois and the children in Tennessee - made visitations difficult; however, the mother maintained regular contact with the children by telephone and letters, circumstances which did not support a finding that the mother abandoned her children by willfully failing to visit them. *In re B. D.*, 2009 WL 528922, at *9.

Mother's only attempt to visit her child in over a year and a half. More significantly, this one instance does not excuse Mother from failing to make any other efforts to visit her child during the relevant four-month period. Furthermore, it is consistent with a continuous pattern of Mother not exercising her visitation rights over the three years prior to the filing of the petition.

Mother testified to only two specific requests for visitation with the child which were denied by Father or Step-mother, neither of which were during the relevant time period. Mother's first request was in September 2011 when the child's grandmother came to visit and they arranged for breakfast with the child, but Father and Step-Mother canceled. Another was, post-petition, in November 2013, when the child's grandfather was coming to visit. Mother testified she texted Step-mother a request to visit, but she never received a response.

The evidence in this record falls far short of establishing that Father or Step-Mother "actually prevented" or "significantly interfered" with Mother's attempts to visit her child during the relevant four-month period. Even assuming arguendo that the September 2011, November 2012, and November 2013 visits had occurred, the evidence clearly and convincingly supports the conclusion that these visits would amount to "token visitation."[6]

Based on the foregoing, we affirm the trial court's ruling that Mother willfully failed to visit her child during the determinative four months. *See* Tenn. Code Ann. § 36-1-102(1)(C) and (E).

## II. BEST INTEREST OF THE CHILD

When at least one statutory ground for termination has been found, the trial court is to engage in a best interest analysis using the statutory factors set forth at Tenn. Code Ann. § 36-1-113(c)(2) and § 36-1-113(i). *See In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004). The trial court concluded that Step-mother and Father had proven by clear and convincing evidence that termination of Mother's parental rights was in the child's best interest; however, as Mother correctly notes, neither the written order nor the trial court's ruling from the bench, which is transcribed, identify sufficient findings of fact to form a proper basis for this conclusion.

---

[6] "'[T]oken visitation' means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(1)(C).

A trial court's responsibility to make findings of fact and conclusions of law in termination cases is mandated by Tenn. Code Ann. § 36-1-113(k). *See In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *3 (Tenn. Ct. App. Nov. 25, 2003) (discussing Tenn. Code Ann. § 36-1-113(k)). The necessity of a trial court to identify the specific findings of fact upon which its conclusions of law are based is explained by our Supreme Court in a recent decision:

> The termination statute clearly and unequivocally requires the trial court to make the statutorily required findings and conclusions before granting a petition to terminate parental rights, regardless of whether that petition is opposed. Tenn. Code Ann. § 3-1-113. In two places, subsections (c) and (k), the statute uses mandatory language to describe the trial court's responsibility to make findings of fact and conclusions of law before terminating parental rights. . . . We must adhere to the statute's plain language. Otherwise, we risk infringing on parents' fundamental right to the care and custody of their children, which we deny through the termination of parental rights "only upon a determination of [a] parent's unfitness to be a parent." *In re D.A.H.*, 142 S.W.3d 267, 274 (Tenn.2004). Explicitly reaching those determinations by clear and convincing evidence is also necessary to protect a parent's due process rights. *See Santosky*, 455 U.S. at 747-48, 102 S.C. 1388.

*In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010).

When the mother and step-father in *Angela E.* attempted to distinguish the facts and unique circumstances of their case to avoid the consequence of there being no written findings of fact and conclusions of law concerning each ground for termination and the best interest analysis, the Supreme Court rejected their argument, leaving few, if any, exceptions to the requirement. *Id*. at 254-55. As the court explained:

> Having determined that the required findings regarding grounds for termination were not made in this case, we are constrained to remand it to the trial court for further expedited proceedings. *We may not conduct de novo review of the termination decision in the absence of such findings.*

*Id*. at 255 (emphasis added). Thus, specific findings of fact and conclusions of law concerning each ground for termination and whether termination is in the child's best interest are required. *See id*.

In the instant case, when ruling from the bench, the findings identified by the trial court concerning the child's best interest reads as follows:

-11-

Now, it is one of the hardest things I have to do in my job, but my obligation is to look out for the best interests of the child in this case, Kaiden L.T., and the court finds that [Father and Step-mother] have been providing all of the support and have been acting as parents to the child, and the child has bonded well with his stepmother. The court finds clear and convincing evidence that it is in the best interest of Kaiden L.T. for termination to occur.

The only statement in the final order that pertains to the child's best interest reads as follows:

[T]his court finds by clear and convincing evidence that Respondent has, for a period of four consecutive months immediately preceding the filing of the Petition, willfully failed to visit with the minor child and has willfully failed to support or make reasonable payments toward support of the minor child, all resulting in abandonment as defined by Tenn. Code Ann. § 36-1-102, and that the termination of Respondent's parental rights to this child is in the best interest of the child.

Having reviewed both of the trial court's rulings, the only "findings of fact" that pertain to the issue of best interest are "that [Father and Step-mother] have been providing all of the support and have been acting as parents to the child, and the child has bonded well with his stepmother." Considering the brevity of these findings, we have concluded that they do not satisfy the mandatory requirements of Tenn. Code Ann. § 36-1-113(k). Our determination is based, in part, on a comparison of these findings with those by other trial courts. One excellent example appears in *In re Travion B.*, No. E2012-01673-COA-R3-PT, 2013 WL 4461903 (Tenn. Ct. App. Aug. 19, 2013).[7] In that matter, the trial court engaged in a thorough analysis of the relevant statutory factors to be considered in Tennessee Code Annotated § 36-1-113(i) when deciding what is in the best interest of a child:

1. The mother has not made any significant adjustment in her circumstances since the children came into the custody of the Department of Children's Services so as to make the children safe in her home. Mother has not addressed her own issues so that she can attend to the needs of the children. Mother has not acknowledged her role in causing the injury to Davion, and absent that she

---

[7]Other excellent examples of specific findings of fact by trial judges in termination cases appear in *State, Dep't of Children's Servs. v. Estes (In re Q.E.)*, 284 S.W.3d 790, 797-99 (Tenn. Ct. App. 2008); *In re Candice S.*, No. M2013-01750-COA-R3-PT, 2014 WL 576022 , at *8, n.6 (Tenn. Ct. App. Feb. 12, 2014); *In the Matter of Dakota M. S.*, No. M2012-01043-COA-R3-PT, 2013 WL 458184, at *11-12 (Tenn. Ct. App. Feb. 5, 2013); and *Jamie T. v. Crystal G.*, No. M2012- 02225-COA-R3-PT, 2013 WL 1804263, at *5-6 (Tenn. Ct. App. Apr. 29, 2013).

cannot prove any adjustment in her circumstances to make it safe to place her children with her.

2. Mother has not effected any significant adjustment, much less a lasting adjustment after appropriate and timely services put in place by the Department of Children's Services to address the mother's parenting. Mother lost control and injured her child. She has not cooperated with mental health services to attempt to address the issues which led to her loss of control and [to] try to ensure that such loss of control does not happen again. Given the time these children have been in custody and the time devoted to attempting to resolve the various family issues, it does not reasonably appear that such an adjustment is possible.

3. Mother has continued to visit the children with regularity and respond to their needs during visits, and appears to love her children.

4. Mother clearly has a meaningful relationship with these children.

5. Changing caretakers at this point, after about one-half of Travion's life and nearly all of Davion's life would be detrimental to the children's emotional, psychological and medical conditions, especially Davion.

6. Based on the Court's finding that [Mother] severely abuse[d] Davion [B.], factor 6 weighs against [Mother].

7. Although the mother's home is physically safe for the children, the Court's concern is mother's continued drug use during the time that she had these children, up to the day before the incident in question. Of further concern is [Mother's] attempts to have [D.B.] lie to DCS and law enforcement regarding [Mother's] drug usage.

8. Mother's emotional/mental status weighs against the mother as she failed to meaningfully participate in counseling, even to address the trauma associated with losing children to the custody of the Department of Children's Services. Her prognosis for change is poor given her resistance to any sort of disclosure during counseling. Mr. Ownby's testimony makes clear that [Mother] continues to minimize her involvement in causing Davion's injuries and continues to deny responsibility. Her emotional/mental inability to acknowledge her role in causing the injuries prevents her from making progress to provide a safe home for the children.

9. Mother has paid support for these children while in the custody of the Department of Children's Services.

10. Ending the parent-child relationship will benefit the children as they will now be able to move on with their lives knowing that their mother will not be in their lives and they can unreservedly attach to appropriate [sic].

*In re Travion B.*, 2013 WL 4461903, at \*9-11. Based on the above findings, the trial court concluded that it was in the children's best interests to terminate the mother's parental rights, which ruling we affirmed on appeal. *Id*. at \*11.

For the foregoing reasons and following the protocol set forth in *Angela E.*, we are constrained to remand the issue of the child's best interest to the trial court for "we may not conduct a de novo review of the termination decision in the absence of such findings." *In re Angela E.*, 303 S.W.3d at 255 (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App.2007)). As a final note, and consistent with our Supreme Court's acknowledgment in *Angela E.*, we are mindful that our decision will unfortunately prolong the uncertainty for the child and parties; however, the termination statute and the constitutional implications require remand. *See id.* (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).

### IN CONCLUSION

We affirm the trial court's rulings that Mother abandoned her child by failing to support the child and by failing to visit the child pursuant to Tenn. Code Ann. § 36-1-113(g)(1); however, because the trial court failed to make specific findings of fact and conclusions of law as mandated by Tenn. Code Ann. § 36-1-113(k), we reverse the termination of Mother's parental rights and remand with instructions for the trial court to provide written findings of fact concerning whether termination of Mother's parental rights is in the best interest of the child and to enter judgment consistent with its findings.

Costs of appeal are assessed as follows: one-half to Mother, and one-half to Father and Step-mother.

_____
FRANK G. CLEMENT, JR., JUDGE